Mark C. Manning
Mark C. Manning, P.C.
1000 O'Malley Road, Ste. 202
Anchorage, Alaska 99515
(907) 278-9794 Fax: 278-1169
manning@alaska.net
Counsel for Plaintiff

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

| | |
|---|---|
| ALASKA MARINE RESPONSE LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| GLADIATOR, official number 598380, and its engines, tackle, gear, boats, apparel, furniture, cargo, contents, appurtenances, necessaries, and equipment, *in rem*, and TRIDENT SEAFOODS CORPORATION, *in personam*, | ) |
| | ) |
| Defendants. | ) |
| | ) Case no. 3:16-cv- |

## COMPLAINT

Alaska Marine Response LLC alleges the following for its Complaint:

1. This is an admiralty and maritime action within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. This court has jurisdiction of the subject matter of this action pursuant to U.S. admiralty and maritime law, 28 U.S.C. § 1333, and Rule C of the Supplemental Rules for Admiralty or Maritime Claims.

2. At all material times, Alaska Marine Response has been, and still is, a limited liability company, organized under the laws of Alaska and having its principal place of business in Cordova. Its members are Andrew K. Craig and Seawan J. Gehlbach, both of whom reside in Cordova.

3. Alaska Marine Response is informed and believes, and on that basis alleges, that at all material times, the fish processing vessel GLADIATOR, official number 598380, has been owned

*Alaska Marine Response v. GLADIATOR*
Case No. 3:16-cv-

Case 3:16-cv-00113-SLG   Document 1   Filed 06/06/16   Page 1 of 10

by Trident Seafoods Corporation. Trident's principal place of business is in Seattle, and it does commercial fishing-related business seasonally at multiple locations in Alaska. At all times relevant to the claims in this action, Edward French was captain of GLADIATOR and an employee of Trident.

4. Alaska Marine Response LLC was formed in 2009 and has been steadily responding to vessel casualties since. The company has provided pollution mitigation, vessel salvage and other vessel assist services to owners and insurers of tugs and fishing, tender, freight and recreational vessels. In 2012, the Coast Guard awarded Alaska Marine Response a Basic Ordering Agreement to provide labor, equipment and materials to contain, clean up and mitigate oil spills. It is the principal BOA contractor for Prince William Sound. Craig has resided in Cordova since 1991. By reason of a long history of work in the Prince William Sound marine community, he is very experienced in the Sound's marine and weather environment. Primarily by reason of his work experience, Alaska Marine Response is thoroughly aware of, and connected with, resources and vendors available locally and able to call on them as needed by particular projects.

5. Alaska Marine Response has pursued, developed and invested in a professional salvage business. Over time, it has acquired and stored equipment for use in salvage operations and to mitigate risks to the marine environment. Alaska Marine Response purchased the 75 foot salvage tug OSWELL FOSS, formerly a Foss ocean tug. It is powered by a 450 horsepower Enterprise main, turning a 6 foot propellor. Craig also owns the 33 foot ALENA K, built in 2004 as a duel purpose salvage and fishing vessel, but used primarily for salvage. It is fitted with a dive door, 3 inch dewatering pump and multiple crane sockets. The 32 foot RADIANT DAWN is owned by Alaska Marine Response's dive master, Mark Heidbrink. Both these vessels cruise at 25 knots and can make 28 knots loaded when time is of the essence. Their primary role is to deliver manpower, pumps and pollution mitigation equipment to a casualty as quickly as possible.

6. Sometime before 2000 hours on August 14, 2015, GLADIATOR apparently struck a pinnacle off Flemming Island in Prince of Wales Passage. GLADIATOR's captain issued a MAYDAY call on VHF channel 16, stating his vessel had struck a rock and flooding was out of control. He radioed that he needed pumps and assistance.

7. At the time of GLADIATOR'S call for assistance, Salvage Tug OSWELL FOSS was about 2 miles south of Pt. Helen, with the damaged and salvaged 87 foot tender vessel EGEGIK SPIRIT under tow en route to Seward. Accompanying OSWELL FOSS were ALENA K and RADIANT DAWN. RADIANT DAWN was manned by 2 crew, and equipped with a 2 inch pump with 40 feet of suction hose, a 3 inch pump with 20 feet of suction hose, a set of dive gear, 450 feet of containment boom, anchors and a dozen bales of sorbent. It immediately broke away from the flotilla and proceeded at about 28 knots to intercept GLADIATOR. ALENA K came alongside OSWELL FOSS and took aboard two 3 inch pumps, two 1.5 inch electric submersible pumps, 80 feet of 3 inch suction hose, 100 feet of 1.5 inch hose, a damage control kit, strainers and a pump kit of various camlock fittings for rigging pumps. ALENA K, manned by 3 crew, then followed RADIANT DAWN at about 28 knots. These vessels' immediate objectives were to help control GLADIATOR's reported flooding and, as soon as feasible, to place boom around the vessel to avoid or mitigate pollution and environmental damage.

8. OSWELL FOSS followed at about 8 knots, with EGEGIK SPIRIT still in tow. OSWELL FOSS carried additional pumps and steel hull patching resources, including plywood, neoprene, expanding foam, lift bags, plate steel, splash zone, threaded rod, epoxy, concrete and tarps. OSWELL FOSS also had computers, printers and cellular data service aboard to produce and transmit written plans from OSWELL FOSS to federal and state agencies as is generally required to obtain agency approvals for response activities.

9. After traveling about 12 miles, RADIANT DAWN and ALENA K reached GLADIATOR while it was still proceeding to a grounding location. RADIANT DAWN and ALENA K shadowed GLADIATOR as it made for a beach. As the tide rose, GLADIATOR's captain intentionally grounded the vessel at the bow on a pebble and rock beach on the west side of Prince of Wales Passage to help control flooding by largely blocking the worst of the holes, which were up forward, with beach material. Its captain also hoped to prevent sinking should the pumps fail, the hull open up further, or some of the rocks that could be seen from the inside plugging holes in the steel hull plate fall out and increased flooding result. This was the site of a stream catalogued by the Alaska Department of Fish & Game as anadromous fish stream #226-40-16451. A salmon return was occurring at the time.

10. After GLADIATOR made the beach, Alaska Marine Response crewmembers boarded over the stern, bringing pumps and hoses. Alaska Marine Response's experienced crew rigged Alaska Marine Response's pumps, re-rigged GLADIATOR pumps, and directed GLADIATOR crew as needed. The pump hoses Alaska Marine Response personnel supplied enabled them to pump the flooding engine room with pumps placed outside the engine room, avoiding contamination of the engine room's atmosphere with pump engine exhaust fumes. This, in turn, facilitated a proper assessment of flooding and damage while keeping ahead of the ingress of water.

11. OSWELL FOSS reached the vicinity at about 2120 hours and placed EGEGIK SPIRIT at anchor nearby. Alaska Marine Response's Salvage Master Craig and Chief Engineer were transported to GLADIATOR at its captain's request to lend assistance onboard. At this point, GLADIATOR remained aground in the mouth of the anadromous stream, with her single main engine in gear. The tide was rising, and the ship's press against the gravel beach reduced flow through the worst of the holes, allowing pumps to maintain water level below engine room floorboards. The flooding level remained low enough to allow operation of the main engine and one of two auxiliary generators in the engine room. The other auxiliary powerhead was flooded and inoperable. Had there been additional flooding, both the main and the remaining auxiliary would have been swamped, leaving the vessel without power. Had that occurred, Alaska Marine Response had the capacity to provide power and keep pumps operating. Fuel leaked steadily into the engine room from an adjacent damaged tank. The vessel's large 6 inch installed circulation pumps lost prime and failed repeatedly because the sea chests on both sides of the boat became plugged with kelp and weeds.

12. At about 2200 hours, Captain French formally requested continued salvage assistance from Alaska Marine Response. Alaska Marine Response provided him its standard form marine salvage no cure-no pay contract, which he executed after consultation with vessel owner Trident Seafood's Seattle office. A copy of the contract is attached hereto as Exhibit 1. Alaska Marine Response's salvage master generated a plan to refloat and stabilize the boat before high tide, while minimizing pollution. The plan was communicated to and accepted by Coast Guard MSU Valdez. The Coast Guard directed that the vessel master and all Alaska Marine Response and GLADIATOR crew were to implement this plan. Tasks included, but were not necessarily limited to, transferring

all fuel on GLADIATOR to undamaged tanks in the stern of the vessel, obtaining a full fuel inventory of the 10 fuel tanks and day tank, rigging tarps with weights and lines to deploy over the bow and drag under the bottom to cover the worst of the damage, and re-plumbing the hydraulic system to enable deployment of GLADIATOR's anchor when the vessel was refloated.

13. To make the anchor operational, the hydraulic system had to be reconfigured to be driven off the main engine. The usual electric driven hydraulic pump that powered the anchor windlass was driven by the auxiliary generator that had flooded. This work was done by GLADIATOR's engineer and two Alaska Marine Response crew working together to problem-solve, find adaptors, and connect hydraulic lines. After preparations were made, fuel was transferred aft, away from the known damage, and GLADIATOR was refloated before high tide. Tarps were rigged by Alaska Marine Response and all personnel assisted in lowering them under the bow and securing them in position. The tarps were pulled under the bow, holding back the flood of water so that remaining pumps were able to maintain water level under floorboards in the engine room without the boat having to go dry as the tide receded. Tarps the GLADIATOR had on board were used, but Alaska Marine Response had additional tarps, if needed. Fuel on board, first estimated at somewhat less than 20,000 gallons, was inventoried in aft tanks at 14,700 gallons and holding.

14. Had the vessel not been refloated and had it been able to sit high and dry in the mouth of the stream, without listing dangerously, all damaged tanks and machinery spaces would have drained into the intertidal zone of an anadromous stream. The rising tide would have carried pollution into the stream, which was probably tidal for its first 300 yards. There would also have been additional stress to the already severely damaged hull. Access to the damaged portion of the hull would have been difficult, if not impossible. Refloating the vessel assured that any fuel tanks with damage to the bottoms, but with intact sides and tops, would not dump their contents, but instead hydrostatic pressure would keep the fuel in place until it could be transferred to intact tanks.

15. At 0340 hours on August 15, Trident Seafood's F/V FARWEST LEADER was anchored adjacent to the beach, primarily to take fuel from GLADIATOR. GLADIATOR was moored alongside. Alaska Marine Response placed containment boom around both vessels, with sorbent sweep and sausage boom in place, to control pollution. Daylight found GLADIATOR floating on tarps and pumps in shallow water, moored alongside FARWEST LEADER. Trident's

contracted Oil Spill Response Organization arrived on site later in the day and found the vessel boomed and adequate sorbent in place to clean up residuals. After surveying the shoreline for a half mile in each direction from the creek where GLADIATOR had been aground, the Oil Spill Response Organization found no remaining pollution. Pollution from the lacerated hull had been contained.

16. Damage was assessed internally and OSWELL FOSS was moored alongside the damaged starboard side of GLADIATOR. Alaska Marine Response dive operations started assessing damage and patching while working back the tarps. Hull damage was extensive. The steel hull plating was torn and crumpled extensively enough that internal concrete patches would be needed to stabilize the majority of the accessible damage before transiting the exposed northern Gulf of Alaska to Seward. Seward was the nearest port where GLADIATOR could be hauled and repaired. Much of the damage was in hull plates under tanks that were integral with hull construction and sealed on the inside. These were not immediate concerns when controlling flooding, but needed to be surveyed and stabilized, before the added stress of transiting.

17. Alaska Marine Response formulated a plan to build forms and place concrete patches. A full float-equipped Beaver load (twenty-two 60 pound bags) of concrete was delivered from Cordova. An additional full load was delivered on August 16, after all forms had been constructed. Alaska Marine Response's home office in Cordova handled all logistics of flying out patch materials, kept a standard response communications schedule, and coordinated with agencies and owners associated with the other active responses. Due to the location of the grounding site in a non-cellular coverage area of Prince William Sound, communications and document transmissions were limited.

18. Dive operations to survey damage and patch holes on the exterior, and crews designing, patterning and constructing concrete forms and mixing and pouring concrete in the interior of the vessel continued through August 15 and 16. Concrete was mixed on deck by Alaska Marine Response crew and GLADIATOR crew assisted by carrying buckets of concrete from the deck to the bilges where it was placed into the forms by Alaska Marine Response crew.

19. On August 16, Alaska Marine Response's Salvage Master participated in teleconferences with owners and agencies (USCG, ADEC, ADNR) about a Site Safety and Health Plan and on the Transit Plan to Seward for August 17. Alaska Marine Response submitted a Site Safety and Health Plan that had been composed on OSWELL FOSS' computers. Arrangements had been made for a

*Alaska Marine Response v. GLADIATOR*
Case No. 3:16-cv-    6

marine surveyor to attend on the 17th on behalf of vessel insurance underwriters, but due to the weather forecast all concerned (agencies, owners, surveyor and vessel captain) accepted the condition assessment presented by the Salvage Master. Based on the Salvage Master's assessment, USCG approved weather- dependent transit to Seward after transfer of excess fuel to FARWEST LEADER. To avoid predicted worsening weather and transit in fair weather the next morning, all hands labored to transfer fuel and to mix and pour concrete until past midnight.

20. At 0600 August 17, Alaska Marine Response's Salvage Master assessed the curing concrete patch, the ingress of water and the position of pumps, condition of the vessel, captain and crew, and forecast weather conditions, and deemed them all adequate for transit. Prior to getting underway, Coast Guard MSU Valdez was notified that all factors were favorable. All hands turned to untying from GLADIATOR, making up to tow EGEGIK SPIRIT with OSWELL FOSS, and proceeding to Seward in company with FARWEST LEADER, ALENA K and RADIANT DAWN.

21. The voyage to Seward began at 0700 August 17. Alaska Marine Response maintained communication with the other vessels in the group, with MSU Valdez and with Coast Guard Sector Anchorage on a two hour communication schedule. Safe transit was completed at 2000 hours. Alaska Marine Response crew went aboard GLADIATOR after it was moored adjacent to the Seward haul-out facility and found all patches were holding, ingress of water was not increasing and Alaska Marine Response's pumps and GLADIATOR- supplied pumps with Alaska Marine Response hoses were in position and maintaining water level below the engine room floor boards. The vessel was boomed by Global Diving as a pollution precaution and was scheduled for haul-out the afternoon of August 18. At 1130 hours on August 18, Alaska Marine Response made its last visit to GLADIATOR before it was hauled, retrieving its pumps but leaving 40 feet of 3 inch and 20 feet of 2 inch suction hose with the crew to enable them to properly rig their on- board emergency pumps.

22. During the casualty response, Captain French stated GLADIATOR's value was $14,000,000.00. On information and belief, GLADIATOR's post-salvage value was $13,500,000.00. Trident has refused a request to provide documentation with which to firm up the post-salvage valuation.

/

Case 3:16-cv-00113-SLG   Document 1   Filed 06/06/16   Page 7 of 10

## FIRST CAUSE OF ACTION: CONTRACT SALVAGE

23. Alaska Marine Response has a salvage contract with Trident and with GLADIATOR entitling it to compensation in accord with the terms of the contract. In accord with those terms, Alaska Marine Response is entitled to compensation from defendants, jointly and severally, of at least $2,025,000.00, the exact amount to be proven at trial.

24. The contract provides that Alaska Marine Response is entitled to recover costs and legal fees incurred in this action.

## SECOND CAUSE OF ACTION: PURE SALVAGE

25. Alaska Marine Response realleges paragraphs 1 through 22 of this Complaint.

26. If Alaska Marine Response does not have an enforceable claim for contract salvage for all or any portion of its work, then it has a claim for pure salvage, governed by federal admiralty and maritime law. It also pursues pure salvage claims in trust for its crew, employees, partners, joint venturers and contractors who participated in rendering the savage services. GLADIATOR was plainly in marine peril, and was rescued from that peril thanks to the prompt, expert and efficient salvage effort lead by Alaska Marine Response. Alaska Marine Response and its crew, employees, partners, joint venturers and contractors are entitled to recover compensation from defendants, jointly and severally, of at least $2,025,000.00, the exact amount to be proven at trial.

WHEREFORE, Alaska Marine Response requests the following relief:

1. that the Court issue an *in rem* warrant of arrest instructing the U.S. Marshal to arrest GLADIATOR and its engines, tackle, gear, boats, apparel, furniture, cargo, contents, appurtenances, necessaries and equipment, and to detain it in his custody subject to further order of the Court;

2. that the salvage services rendered GLADIATOR be declared to have a value of at least $2,025,000.00, the exact amount to be proven at trial, and to have created a valid and subsisting maritime salvage lien against GLADIATOR that is prior and superior to all other liens, claims and encumbrances whatsoever against the vessel;

3. that the Court enter judgment, jointly and severally, *in rem* in favor of Alaska Marine Response, and, if appropriate, its crew, employees, partners, joint venturers and contractors, against GLADIATOR and its engines, tackle, gear, boats, apparel, furniture, cargo, contents, appurtenances, necessaries and equipment, and *in personam* against Trident Seafoods, in the amount of at least

$2,025,000.00 for salvage services, the exact amount to be proven at trial, and foreclosing Alaska Marine Response's maritime lien;

4. that the Court issue an order directing the U.S. Marshal to sell GLADIATOR and its engines, tackle, gear, boats, apparel, furniture, cargo, contents, appurtenances, necessaries and equipment, in accordance with law, and that the sale proceeds be held in the Registry of this Court to be applied, net of the marshal's commission, first to satisfy Alaska Marine Response's *in rem* judgment;

5. that the Court issue an order for the disbursement of the funds, net of the marshal's commission, to Alaska Marine Response in the first instance to the extent necessary to satisfy Alaska Marine Response's in rem judgment;

6. that the Court award Alaska Marine Response its costs and legal fees incurred in this action; and

7. that Alaska Marine Response be awarded such other and further relief as the Court may deem just and proper in the premises.

DATED at Anchorage, Alaska, this **22**th day of May, 2016.

> s/ Mark C. Manning
> MARK C. MANNING, P.C.
> Counsel for Alaska Marine Response
> 1000 O'Malley Road, Ste. 202
> Anchorage, AK 99515
> Phone: (907) 278-9794
> Fax: (907) 278-1169
> manning@alaska.net
> ABA No. 8110066

/
/
/
/
/
/

*Alaska Marine Response v. GLADIATOR*
Case No. 3:16-cv-                                9

## VERIFICATION

### 28 USC §1746

I am a member of Alaska Marine Response LLC. I have read the foregoing Complaint. The facts alleged in the foregoing Complaint are true and correct to the best of my knowledge, information and belief. I am authorized to make this verification on Alaska Marine Response LLC's behalf.

5-22-16
Date

Andrew K. Craig